J-A05034-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL M. SENFLUG | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EMILY G. GREBB | : | |
| | : | |
| Appellant | : | No. 2351 EDA 2022 |

Appeal from the Order Entered August 1, 2022
In the Court of Common Pleas of Monroe County
Civil Division at 002760-CV-2020, 497 DR 2018

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MARCH 21, 2023**

Michael M. Senflug (Appellant) appeals from the order modifying the parties' custody of their six-year-old son, M.S. (Child).[1]  Appellant specifically challenges the award of primary physical custody to Emily G. Grebb (Mother), and the court's directive that Child be enrolled in the Pocono Mountain School District.  After careful review, we affirm.

_____

[1] The order schedules a "hearing for October 21, 2022 … to review the parties' progress in co-parenting and [to] address any additional custody matters." Order, 8/1/22, at 9.  Nonetheless, we consider the order to be final and appealable.  **See** Pa.R.A.P. 341(b)(1) (a final order is any order that disposes of all claims and of all parties); **see also G.B. v. M.M.B.**, 670 A.2d 714 (Pa. Super. 1996) (a custody order is final and appealable after the trial court has concluded hearings and the resulting order resolves pending custody claims).

Appellant and Mother never married. Mother was married previously, and had three older children when she met Appellant in 2014. N.T., 3/16/22, at 52-53. Mother had issues with alcohol abuse and the children's father was incarcerated; thus, the older children's paternal grandfather and his wife had custody of the children. *Id.* at 54.

Appellant and Mother moved in together, and Child was born in August 2016. Around the same time, Mother regained custody of older children.[2] N.T., 7/15/22, at 185. The parties separated in April 2020. N.T., 3/16/22, at 12, 139; N.T., 7/15/22, at 61.

## PROCEDURAL HISTORY

On November 3, 2020, when Child was four-years-old, the parties entered a consent order which provided for shared legal and physical custody. The order, *inter alia*, stated that Child "shall be enrolled in Notre Dame for kindergarten, without prejudice to either party's right to seek a change of schools." Order, 11/3/20, at 6, ¶ 8. The order also required that Mother "continue with drug and alcohol screens, providing same on a random basis once or twice per week … for a minimum of one (1) year." *Id.* ¶ 9b.

Approximately six months later, the parties could not agree about whether Child should attend kindergarten in the fall of 2021. Due to Child's

---

[2] Mother's two oldest children are twins; they turned 18 and graduated from high school in 2022. N.T., 7/15/22, at 30, 63. Mother's third child is a sophomore in high school. *Id.* at 65.

- 2 -

August birthday, Mother believed it best for Child to attend a year of preschool and attend kindergarten the following year in the Pocono Mountain School District. Both parties reside in the Pocono Mountain School District. However, as indicated in the November 3, 2020, order, Appellant believed Child should attend kindergarten at Notre Dame Elementary School (Notre Dame).

On May 24, 2021, Mother filed a petition seeking an evidentiary hearing, primary physical custody, and a determination that Child attend a year of preschool before starting kindergarten. Petition for Evidentiary Hearing, 5/24/21. Appellant filed a responsive petition in which he sought Child's 2021 kindergarten enrollment at Notre Dame, with the parties to maintain shared physical custody, or alternatively, an award of primary physical custody to Appellant. Petition for Modification of Custody, 6/15/21.

The trial court conducted three days of trial on December 8, 2021, March 16, 2022, and July 15, 2022. Given the trial dates and consistent with the November 3, 2020, order, Child commenced and completed kindergarten at Notre Dame.

**TRIAL TESTIMONY**

Ms. Brenda Hoff testified to having a master's degree in psychology and counseling the parties about co-parenting. N.T., 12/8/21, at 8-9, 43. Ms. Hoff described "high conflict between the parents," but noted an improvement in Mother's "ability to communicate without anger." *Id.* at 10, 28. She observed that Appellant "struggles to negotiate and compromise." *Id.* Ms.

- 3 -

Hoff also "identified [Appellant] as unwilling to negotiate and reach compromises in general and I use [] school as an example[.]" *Id.* at 72. She added, "this is just an ongoing thing that's … part of [Appellant's] personality." *Id.* at 74. Ms. Hoff cited examples of Appellant being unwilling to negotiate and compromise in matters concerning Child's participation in a Halloween parade and community soccer, and whether Child should return to school after being sick the prior weekend. *Id.* at 74.

Ms. Hoff testified that Mother "acknowledged that she is a recovering alcoholic with more than two years of sobriety[.]" *Id.* at 24. She stated that "every single one" of Mother's urine screens had been negative "since this last year." *Id.* at 25. Ms. Hoff specified that Mother "was two years sober with a slip in the fall of 2019." *Id.* at 42.

Ms. Hoff testified that one of the "major issues we spent a significant amount of time trying to negotiate was [Child's] education." *Id.* at 14. The parties disputed whether Child was ready to attend kindergarten during the 2021-2022 school year, and where Child would attend kindergarten. Both parties live in the Pocono Mountain School District. *Id.* at 18. Ms. Hoff reiterated that the issue "has been a big sticking point since [Ms. Hoff] first saw [the parties] early on in their time together." *Id.* at 14. Ms. Hoff stated she had "no opinion on whether [Child] should have attended kindergarten or where he should have attended kindergarten, and I was very clear on that with the parents on multiple occasions." *Id.* at 59.

Ms. Hoff relayed that "one of Mother's concerns" with Notre Dame "was the amount of time [Child] would have to be transported and how he's transported." *Id.* at 21. According to Ms. Hoff, Mother preferred Child "attend school in the community where both parents live," and Mother "also noted that neither parent [is] Catholic, so it didn't necessarily make sense for [Child] to be in a Catholic school." *Id.* at 26.

Ms. Hoff testified about Mother's concern that Child's August birthday was "right before the cut off" for kindergarten. *Id.* at 25. She stated that Mother had "previous experience with another child and thought it would be best for [Child] emotionally and matur[ity] wise for him to attend preschool prior to kindergarten." *Id.* Ms. Hoff confirmed Child was "academically ready for school," and Mother's concern was for Child "emotionally, socially, and [his] maturity." *Id.* at 27. Ms. Hoff explained that according to Mother, Child was "very tired and drained when he comes home" from kindergarten at Notre Dame. *Id.*

Regarding Appellant, Ms. Hoff testified that he "tends to not really negotiate unless he is guaranteed his desired outcome." *Id.* at 14. She described Appellant as "unyielding." *Id.* at 59. She relayed that Appellant wanted Child to attend Notre Dame "because he thinks it's the best school[, and] believes that's the best place for [Child] to go to school." *Id.* at 60. According to Ms. Hoff, Appellant "believed [Child] was emotionally [prepared]

and mature and ready to go to kindergarten." *Id.* at 60-61. Ms. Hoff further testified that Appellant,

> wanted to know what he needed to agree to in order for [M]other to agree for [Child] to go [to Notre Dame]. In fact, at one point, he was willing to drop the urine screens for [M]other if she would agree for [Child] to go to Notre Dame Elementary School, which I found odd because we tried to negotiate that point early on and he refused to drop the urine screens, indicating that he believes that they were, quote, absolutely necessary.

N.T., 12/8/21, at 21-22.

Mother's 18-year-old son, Tyler Grebb, testified to attending Pocono Mountain East High School. *Id.* at 128, 139. He stated that Mother, his father (who is no longer incarcerated), and his paternal grandparents, "all get along [and are] there for each other." *Id.* at 133. He confirmed that at the time of the December 8, 2021, hearing, Mother was "closing in on three years of sobriety." *Id.* at 136. He stated there was no alcohol in Mother's home, and it would be "pretty obvious" to him if Mother was drinking. *Id.*

Mother's former father-in-law, Don Dellipriscoli, testified to being the paternal grandfather of Mother's three older children. *Id.* at 153. Mr. Dellipriscoli's son (and Mother's former husband) was incarcerated from 2008-2010, and from 2013-2020. *Id.* at 154. As a result of his son's incarceration and Mother's alcohol abuse, Mr. Dellipriscoli and his wife obtained custody of the older children. However, in 2016, Mother regained "almost a 50/50 share" of custody. *Id.* at 175. Mr. Dellipriscoli described their shared custody:

> The last two years, it was very good. It was very productive. …
> [T]he last few years that we were co-parenting, communication

was there, the trust was there, and it was pretty smooth, very fluid through the last few years.

*Id.* at 154.

He continued:

When [Mother] was using and she was struggling, she was still a good parent, but it was sporadic. She --- you know, for the most part she was good, but then she'd have periods that she wasn't because of her … substance abuse. But even going through everything, my wife and I always were with her.

And she finally got what I was saying to her when she got sober. [M]y wife and I were never out to take the kids away from her. We were there to protect the kids. The [c]ourt got involved and we were there to protect them. And I was always telling her the only person that is keeping the kids away from you is yourself and your drinking.

And now she understands that, and so she's a great parent when she's sober. She was a good parent when -- during the struggles, but sporadically. You know, she would have spells. I tell her I'm proud of her that she's sober -- and she puts so much effort into her sobriety.

*Id.* at 163.

Appellant's father, Myles Senflug (Paternal Grandfather), testified to having a "good relationship" with Mother, and getting "along actually pretty well." N.T., 3/16/22, at 10. In April 2020, after the parties separated, Paternal Grandfather moved in with Appellant; he has since helped care for Child when Appellant has custody. *Id.* at 12-13, 21. Paternal Grandfather testified that Child really enjoyed attending Notre Dame. *Id.* at 33. Paternal Grandfather opined that it would be "devasting" for Child if he was required to change schools. *Id.* at 33-34.

Appellant testified to meeting Mother in 2014. *Id.* at 54. He stated that "the relationship took flight pretty rapidly," and the parties moved in together. *Id.* Appellant bought a home in the Pocono Mountain School District where he continues to reside. *Id.* at 55. He stated that he bought the home with "enough bedrooms so [Mother could] regain custody of her [older] kids." *Id.* Mother entered rehab, and by 2016, she had custody of the older children "around 50-50." *Id.* at 56. Child was born in August 2016. *Id.*

Appellant testified that Mother relapsed in February 2019. *Id.* at 60-62. After attending a 28-day inpatient program, Mother returned to the parties' home. *Id.* at 62-63. Appellant and Mother separated in April 2020. *Id.* at 139. The trial court asked Appellant whether he "had seen anything [recently] … to give [Appellant] concern about [Mother's] sobriety?" *Id.* at 112. Appellant responded that he had concerns for Mother's "attention to detail," but did not see anything "evidentiary" to indicate Mother was drinking. *Id.*

Appellant works for a trucking company and has a flexible schedule. N.T., 7/15/22, at 31. Appellant and Mother communicate primarily through the Our Family Wizard website. *Id.* at 32, 38, 99, 112. Appellant testified at length about his parenting capabilities, activities with Child, and his views about Child's best interests. N.T., 3/16/22, at 49-190. Specifically, Appellant opined it was in Child's best interests to attend Notre Dame, where Child is doing "outstanding" academically and socially. *Id.* at 115-22. According to

Appellant, "one of the huge pros about Notre Dame is their COVID mitigation … and what they do to mitigate risk[.]" *Id.* at 119.  Appellant also extolled Notre Dame's small class size and superior academics.  *Id.* at 123-24.

Jessica Pedersen testified that the parties agreed to her counseling Child on a weekly and biweekly basis, beginning in February 2022.[3]  N.T., 7/15/22, at 11-12; *see also id.* at 100.  Ms. Pedersen described Child as "very intelligent … very friendly[, and] pretty well adjusted."  *Id.* at 19.  She also relayed Child's statement that his paternal grandmother (Appellant's mother) told Child to tell Ms. Pedersen "who he wants to live with."  *Id.* at 21.

Mother testified that since separating from Appellant in April 2020, she has lived with her children in a rented farmhouse on a 70-acre hay farm.  N.T., 7/15/22, at 61.  Mother works in her family's ceramic import business.  *Id.* at 62.  Her two oldest children turned 18 and graduated from Pocono Mountain East High School in 2022.  *Id.* at 63.  Mother testified that the twins would be leaving to attend college, while her third child would be a high school sophomore.  *Id.* at 64-65.

Mother admitted to struggling with alcoholism and described sobriety as "the most important aspect" of her life.  *Id.* at 66-67.  She has been to rehab three times (in 2008, 2015, and 2019).  *Id.* at 86.  Mother testified that her

---

[3] Ms. Pedersen was working under her supervisor's license at Forensic Counseling Associates while she completed her master's degree in mental health counseling.  N.T., 7/15/22, at 9-10.

sobriety in 2015 was short-lived; after Appellant picked her up from rehab, the couple went to the Mount Airy Casino and "got drunk." *Id.* at 87. The couple remained together for four years while Mother continued to drink. *Id.* at 161. Mother most recently attended rehab in February 2019. *Id.* She "stayed sober until September, [when she had] a one-day slip." *Id.* at 88. She has been sober since; her sobriety date is September 7, 2019. *Id.* at 88, 157, 160. Mother testified to being "very active" in Alcoholic Anonymous. *Id.* at 67 (explaining she co-founded a "home group," and attends district meetings and conferences). Mother stated that "a lot of the service that I do is to help other people, but in reality, it's helping me too." *Id.* at 70.

With respect to physical custody, Mother testified that Child's transitions between households on the shared custody schedule were "rough." *Id.* at 88. Mother desired primary physical custody with fewer transitions between the parties' households, and Child's enrollment in the Pocono Mountain School District. *Id.* at 89. Mother testified that prior to Child attending Notre Dame, Mother

> thought there was going to be a chance to voice my opinions and have them listened to and considered. But from the very first time it was brought up, … there was a wall, an absolute no discussion [*sic*] this is the court order, [Appellant would not] consider [otherwise].

*Id.* at 121.

Mother's concerns increased after Child began attending Notre Dame. She described "numerous" reasons she preferred Pocono Mountain School

District, particularly the "logistics" and impact of Child commuting to Notre Dame, which is 32 minutes by car, or hour and a half by school bus. *Id.* at 89-90, 131. Child's morning bus pick-up time is 6:20 a.m. for Notre Dame; for the Pocono Mountain elementary school it would be 8:15 a.m. *Id.* at 91. With Child attending Notre Dame, he had to go "to bed so early," and his schedule was "so pressured … his schedule [was not] friendly to … a young kid." *Id.* at 92.

Mother also asserted that the Pocono Mountain School District offered "more opportunities" in academics and athletics. *Id.* at 90-91. Mother recognized Child was doing "quite well" at Notre Dame, which "has some positives too[, such as] the small class size." *Id.* at 91, 93, 124. However, she stated, "it's hard enough for a kid to grow up in two homes, in two different towns, and then you take that kid and now put him in a school outside of both those towns. It's going to make it hard for him to set down roots, and I think that's very important." *Id.* at 91. Mother also perceived that the Catholicism of Notre Dame was confusing to Child, because neither Mother nor Appellant are Catholic. *Id.* at 90.

Mother believed Child would do best "with one primary parent during the school week." *Id.* at 97. She testified:

> It's a lot to switch … from one house to another to begin with. And when you do it during the middle of the school week, it just adds a lot of pressure on a kid. … I think I'm better equipped.

> [T]here's been a lot of testimony about comments made to [Child], things discussed with [him] that really shouldn't be discussed with a young child. I have experience. … I have a better capability of being [Child's] primary custodian. [Appellant] is a great, fun dad, you know, to do fun stuff with on the weekends. I just feel like I'm better equipped. I think I can work better with [Appellant]. I think I'm more reasonable and flexible.

*Id.* at 97.

Mother explained that she sought primary physical custody "because I think it's what's best for" Child. *Id.* at 104. She claimed she "could work better with" Appellant, and would "like [the parties] to get to the point where we can work it out amongst ourselves … [Child's] best interests are what are important … not winning." *Id.* The trial court agreed.[4]

**TRIAL COURT DISPOSITION**

On July 27, 2022, the court announced its "decision and final custody order, [] putting the reasons for [the] decision on the record." *See* Trial Court Opinion, 9/20/22, at 1 (unnumbered). The court then entered the order memorializing its verbal ruling. The court granted primary physical custody to Mother. Order, 8/1/22, at ¶ 2. The court further ordered that Child be enrolled in the Pocono Mountain School District for the 2022-2023 school year, and "remain enrolled in the Pocono Mountain School District absent further order of Court modifying that provision." *Id.* at ¶ 7. Appellant timely filed a

---

[4] After the close of evidence, the trial court stated its "intention to … read the transcripts" and review "35 pages of notes." N.T., 7/15/22, at 198. The court stated it would "have [the] parties come back … [for the court's] decision [with the] reasons on the record in case there's an appeal." *Id.*

notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

**ISSUES**

Appellant presents five questions for review:

A. DID THE TRIAL COURT COMMIT AN ERROR OF LAW AND ABUSE OF DISCRETION IN ITS DECREE THAT THE CHILD SHALL BE REQUIRED TO TRANSFER SCHOOLS FROM NOTRE DAME ELEMENTARY SCHOOL TO [AN] ELEMENTARY SCHOOL IN THE POCONO MOUNTAIN SCHOOL DISTRICT, RATHER THAN CONTINUE TO ATTEND NOTRE DAME ELEMENTARY FOR FIRST GRADE?

B. DID THE TRIAL COURT COMMIT AN ERROR OF LAW AND ABUSE OF DISCRETION IN ITS AWARD OF PRIMARY PHYSICAL CUSTODY TO MOTHER, RATHER THAN CONTINUING THE PARTIES' SHARED PHYSICAL CUSTODY OR ALTERNATIVELY, SELECTING [APPELLANT] AS THE PRIMARY PHYSICAL CUSTODIAN?

C. WERE THE TRIAL COURT'S FACTUAL FINDINGS UNSUPPORTED IN THE RECORD AND AGAINST THE WEIGHT OF THE EVIDENCE, CONSTITUTING AN ABUSE OF DISCRETION REGARDING THE RECORD EVIDENCE PERTAINING TO THE STATUTORY CUSTODY FACTORS FOUND AT 23 Pa.C.S. § 5328(a) SUBSECTIONS 1, 4, 5, 10, 11, 12, 13, 14, 15 and 16 (PERTAINING TO THE CONSIDERATION OF WHICH PARENT IS MORE LIKELY TO PROTECT THE CHILD FROM THE COVID 19 VIRUS)?

D. WERE THE TRIAL COURT'S INFERENCES AND CONCLUSIONS MANIFESTLY UNREASONABLE AND AN ABUSE OF THE TRIAL COURT'S DISCRETION, CONSIDERING THE RECORD EVIDENCE PERTAINING TO THE STATUTORY CUSTODY FACTORS FOUND AT 23 Pa.C.S. § 5328(a) SUBSECTIONS 1, 4, 5, 10, 11, 12, 13, 14, 15 and 16 (PERTAINING TO THE CONSIDERATION OF WHICH PARENT IS MORE LIKELY TO PROTECT THE CHILD FROM THE COVID 19 VIRUS)?

E. DID THE TRIAL COURT'S JUDGMENT MISAPPLY OR OVERRIDE THE LAW, RENDERING THE DECISION MANIFESTLY

UNREASONABLE IN ITS APPLICATION OF ITS STATUTORY CUSTODY FACTORS FOUND AT 23 Pa.C.S. §5328(a) SUBSECTIONS 1, 4, 5, 10, 11, 12, 13, 14, 15 and 16 (PERTAINING TO THE CONSIDERATION OF WHICH PARENT IS MORE LIKELY TO PROTECT THE CHILD FROM THE COVID 19 VIRUS)?

Appellant's Brief at 15-16 (reordered).[5]

In reviewing Appellant's issues,

our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted).

Likewise,

on issues of credibility and weight of the evidence, we defer to the findings of the trial [court], who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

---

[5] Appellant withdrew his sixth issue in which he claimed the trial court failed to "set forth its mandatory assessment of the statutory custody factors[.]" Appellant's Brief at ii-iii, 16.

The test is whether the evidence of record supports the trial court's conclusions.

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014) (citations omitted).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (quoting ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa. Super. 2004)).

Appellant's issues implicate the trial court's credibility determinations, findings of facts, and exercise of discretion. In his first issue, Appellant assails the court's directive that Child be enrolled in the Pocono Mountain School District. This Court has explained:

> While the choice of where a child will attend school is not trivial and certainly is a major life decision, the [trial] court's decision … merely resolve[s] an impasse between the parties who share[] the legal right to make this decision. Stated another way, the trial court merely arbitrate[s] a dispute between [parents] regarding schooling, instead of granting one of them the right to make that decision.

***S.W.D. v. S.A.R.***, 96 A.3d 396, 403–04 (Pa. Super. 2014). "This type of court intervention does not affect the form of custody and hence, the 5328(a) best interest factors do not all have to be considered." ***Id.*** at 404.

Appellant asserts the trial court erred given "all of the evidence presented by [Appellant] regarding [C]hild's year of kindergarten, [which]

- 15 -

supported the fact that [Child] did extremely well at Notre Dame and was thriving." Appellant's Brief at 40. Appellant disregards that "parties cannot dictate the amount of weight the trial court places on evidence." **A.V. v. S.T.**, 87 A.3d at 820.

Neither the trial court nor Mother dispute Child's success at Notre Dame. Two weeks after trial, the trial court announced its decision on the record, stating it had "read everything over and over." N.T., 7/27/22, at 2. The court decided the parties would continue to share legal custody, explaining that Appellant "use[d] legal custody and even physical custody … as a power tool, and [custody] is not and never should be, and that's what concerns me." **Id.** The court continued:

> [O]ne of the things that was most startling to me -- and this went back to the December [8, 2021,] hearing -- was [Appellant] was willing to drop the use of urine screens for Mo[ther] if she agreed for [Child] to go to Notre Dame. That is a purest abuse of power in a custody case, because that is [Appellant] getting what [he] wants without focusing on what's best for [Child]. … [T]hroughout, based on the … demeanor and the manner of testimony and the testimony itself provided by [Appellant] and his witnesses made me agree wholeheartedly with Miss Hoff's assessment and with what [M]other testified to at the end.

N.T., 7/27/22, at 2-3.

Accordingly, the trial court decided that Child would attend school in Pocono Mountain School District. **Id.** at 4. The court specified:

> 7, schooling. The minor child shall be enrolled in the Pocono Mountain School District commencing with the 2022-2023 school year. The child shall remain enrolled in the Pocono Mountain School District absent further order of court modifying that provision.

- 16 -

*Id.* at 6-7; Order, 8/1/22, at 6 ¶ 7. The evidence and law support the trial court's resolution of the parties' impasse regarding Child's schooling. ***S.W.D. v. S.A.R.***, ***supra***.

We next address Appellant's challenge to the trial court's award of primary physical custody to Mother. Appellant argues the trial court abused its discretion because, "Overall, the opinion of the [t]rial court reached numerous conclusions that were largely unsupported by the record, and based purely on perception." Appellant's Brief at 39. Appellant claims the evidence "pointed to [Appellant] as taking the more active parental role." *Id.* at 40. He also assails the trial court's opinion as being "largely against the weight of the evidence." *Id.* at 41. We disagree.

Child custody is governed by the Child Custody Act (Act), 23 Pa.C.S.A. §§ 5321-5340. Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) … when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). The statute provides:

> **§ 5328. Factors to consider when awarding custody.**
>
> **(a)** *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>   (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
>   (2) The present and past abuse committed by a party or member of the party's household, whether there is a

- 17 -

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3)    The parental duties performed by each party on behalf of the child.

(4)    The need for stability and continuity in the child's education, family life and community life.

(5)    The availability of extended family.

(6)    The child's sibling relationships.

(7)    The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)    The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)    Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)   Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)   The proximity of the residences of the parties.

(12)   Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13)   The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

> (14) The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

> We have explained:
>
> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). ....
>
> In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 ([Pa.] 2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id*.

*A.V.*, 87 A.3d at 822-23.

> Instantly, the trial court explained:
>
> I'm going to simplify things. Mo[ther] is going to have primary physical custody. [Appellant] is going to have alternating weekends. … And since [Appellant] is -- I think both [parents] are 15 minutes away, [so Appellant will have custody] from Thursday, at six, until Sunday at six so that he at least has one night after school. He can help [Child] with homework and still be a part of that.

And then if Mo[ther] is working, at her discretion, she may give [Appellant] the option of custody, but … I'm going to ask that if Mo[ther] wants to give [Appellant] custody that she gives him as much leeway, I'm not going to put a number on that.

But if you know what your schedule is, Mo[ther], 30 days in advance, and you … have no problem with [Appellant] having [Child] for the weekend because you're going to be working, … then treat [Appellant] like you would want to be treated. You would want to know as far out in advance as [possible].

N.T., 7/27/22, at 4.

Regarding the statutory factors, the trial court found factor 1 (the party more likely to encourage contact between the child and other party), to favor Mother. *Id.* at 11-12. The court found that factors 2 (present and past abuse), 3 (parental duties on behalf of the child), 4 (child's need for stability), and 5 (availability of extended family) did not favor either party. *Id.* at 12-13. The court also found factor 6 (sibling relationships) did not favor either party, "because both parties [live] close to each other, [and Child] would always have a relationship with his older siblings." *Id.* at 13. Similarly, the court did not favor either party as to factor 7 (preference of child) "because of his age," and factors 8 (attempt of parent to turn the child against the other)[6], and 9 (party more likely to maintain a loving and stable home). *Id.* at 14-15.

_____

[6] The trial court advised, "please don't … think that I'm crediting that towards [Appellant] or against [Appellant], because I'm not. But … folks, your child will perceive your feelings towards the other parent." N.T., 7/27/22, at 15. However, the court added, "that factor may work against [Appellant] somewhat." *Id.*

Regarding factor 10 (party more likely to attend to child's daily needs), the court found "both parents are able[, although Mother] comes more organically than [Appellant], but I do think that he can do it." *Id.* at 16-17. The court observed factors 11 (proximity of parties' residences) and 12 (party's availability to care for child or make appropriate child-care arrangements) did not "favor either party. I think both parties are able to make care arrangements for the child, particularly because you have each other within 15 miles of one another." *Id.* at 17.

Critically, the court weighed factor 13 (conflict between parties and parties' willingness and ability to cooperate), in Mother's favor. The court stated the "level of conflict is the next factor, and that is through the roof." *Id.* The court explained:

> [A]s Miss Hoff said, I don't think [Appellant] understands that he can improve or … that he's doing anything that is exacerbating difficult problems. [A]gain, I believe Miss Hoff's testimony, I think her perception is accurate. … I don't think [Appellant] perceives his shortcomings. I think Mo[ther] is aware of her shortcomings, painfully so.
>
> … [B]ecause of what I believe to be [Appellant's] inability to see how his parenting style is not helpful in a co-parenting context, I don't know that he's as able to cooperate and address the conflict as [M]other is.

*Id.* at 17-18.

The court next addressed factor 14 (party's drug or alcohol abuse), acknowledging that Mother "has an issue with alcohol." *Id.* at 18. The court referenced "the time [Appellant] picked Mo[ther] up from rehab, [and] they

went straight to the casino," as indicating Appellant "did not appreciate how to care for somebody who just comes out of rehab[.]" *Id.* The court concluded "this factor, if anything, may slightly favor [Appellant], but again, Mo[ther] is doing everything you want of somebody who has an addiction, she was painfully honest and open about it and credible in her testimony." *Id.*

Addressing factor 15 (party's mental and physical condition), the court stated there was no indication "either party was unable to physically care for [Child,] and I … already discussed the [parties'] mental [and] psychological outlook or perception towards custody." *Id.* at 19-20.

Finally, with respect to factor 16 (any other relevant factor), the court stated it had

> some concerns that there may be some coaching [of Child] … going on at [Appellant's] house, based on … testimony at our last hearing. And I don't know that it's intentional, but certainly, again, that's another reason why I think that factor may slightly favor Mo[ther].

So those are my reasons, folks.

N.T., 7/27/22, at 20.

We discern no error or abuse of discretion by the trial court. We reiterate that this Court may not reweigh evidence, and "must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *M.J.M.*, 63 A.3d at 337 (citation omitted). A custody award depends upon the weight the trial court gives to the statutory factors; the record in this case supports

the trial court's decision to award Mother primary physical custody. The trial court accurately explained:

> We held multiple evidentiary hearings in this matter, with evidence and testimony presented by both sides. At each hearing, we assessed the evidence presented by both parties, and the demeanor and credibility of each witness' testimony. We then announced our custody decision and reviewed each of the custody factors set forth in 23 Pa. C.S. § 5328(a) as it impacted our decision on the record at the hearing on July 27, 2022. We stand by the reasons stated of record, our analysis of the evidence, the weight we gave to the evidence, and our determination as to the credibility of the parties and witnesses.
>
> During the July 27, 2022 hearing, we spoke towards every enumerated factor set forth in § 5328(a), putting our reasoning and our weighting of each factor on the record. We discussed our credibility assessment. In short, we found … Mother's testimony was credible and her decisions regarding custody were made with [C]hild's best interest in mind. We did not find [Appellant] to be as credible as Mother or able to make decisions that were in [C]hild's best interest. Simply put, we found Mother extremely credible and candid, and found [Appellant] lacking in credibility and candor. Further, while we acknowledge that counsel for [Appellant] did an excellent job of questioning Mother as to each statutory custody factor, relentlessly focusing on her addiction issues, the black and white transcript is devoid of the demeanor and tone of the parties and witnesses we observed during the proceedings. It is that demeanor and tone that largely formed our credibility determinations.
>
> Additionally, … [Appellant lacks the] ability to co-parent without having "control" as to custody of the parties' child. We perceived many of [Appellant]'s actions pertaining to custody were done for the primary purpose of "winning" this custody litigation. As we stated, we found that "some of the things [Appellant] did in performing those parental duties was to make himself look good for purposes of custody." There are never winners when parents resort to custody litigation.
>
> We also noted we "don't think [Appellant] perceives his shortcomings. [Mother] is aware of her shortcomings, painfully so." For example, we found [Appellant] picked Mother up from

rehabilitation and took her directly to a casino where both parties imbibed alcohol, a fact [Appellant] failed to acknowledge. Absent an ability to acknowledge shortcomings or vulnerabilities, and concede control, we do not believe [Appellant] has the ability to effectively co-parent or make decisions based on the best interest of [C]hild.

Trial Court Opinion, 9/20/22, at 3-4 (unnumbered, citations to notes of testimony omitted).

In his remaining three issues, Appellant assails the trial court's decision "pertaining to the consideration of which parent is more likely to protect the child from the Covid 19 virus." Appellant's Brief at ii. In his arguments under the corresponding headings, Appellant barely references Covid. *See id.* at 57-78. Appellant's Covid arguments consist of his claims that he "testified extensively regarding COVID-19, when Mother and her family refused to follow CDC guidelines." *Id.* at 70. He also asserts Mother "knowingly exposed" Child to relatives who "had just returned from Florida and had not quarantined for the requisite amount of time." *Id.* Appellant's assertions are misleading.[7] Moreover, he cites no legal authority. It is well settled that an appellant must develop arguments in his brief with citation to the record and

---

[7] Appellant testified that when the Covid-19 pandemic began in 2020, he and Mother disagreed about precautions such as masking. N.T., 3/16/22, at 93-95. However, Appellant testified at trial in 2022 that he and Mother "were kind of in agreement" with Child being too young to be vaccinated. *Id.* at 96. He stated, "we just haven't come to an agreement yet on when the time should be for him to get vaccinated." *Id.* at 96-97. Also, Mother testified to having Covid in April 2022, with mild symptoms that led her to believe she had a cold. N.T., 7/15/22, at 143-44. When Mother learned she had Covid, she emailed Appellant and advised him she had Covid. *Id.* at 146.

relevant authority. Pa.R.A.P. 2119(a). The Rules of Appellate Procedure provide that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. *Commonwealth v. Martz*, 232 A.3d 801, 811 (Pa. Super. 2020).

Appellant further repeats his argument that the trial court improperly weighed the evidence to arrive at a "manifestly unreasonable" result. *See*, *e.g.*, *id.* at 71 (Appellant stating that because "the majority of the Trial Court's conclusions are unsupported in the record, the award of primary physical custody to Mother constitutes an abuse of discretion."). Appellant's issues are unavailing. The trial court properly decided this case after assessing the evidence. "It is within the **trial court's purview** as the finder of fact to determine which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (citation omitted) (emphasis added). "The parties cannot dictate the amount of weight the trial court places on evidence." *A.V.*, 87 A.3d at 820. Accordingly, we discern no error or abuse of discretion.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/21/2023